**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 19, 2015**

# In the Court of Appeals of Georgia

A14A1956. HILDEBRAND v. BANK OF AMERICA, N.A.

BARNES, Presiding Judge.

Janet Hildebrand appeals the trial court's grant of summary judgment to Bank of America, N.A., on its suit on a note for $50,844. Hildebrand argues that the court erred in granting the motion because the note was secured by a second mortgage that was "inextricably intertwined" with the first mortgage, which was foreclosed upon but not confirmed. For the reasons that follow, we affirm.

Hildebrand bought a condominium in July 2006. She borrowed $257,380 from the CDC Federal Credit Union, which prepared an "80-20" mortgage loan package for her to sign. At the closing, Hildebrand signed two promissory notes, one for $205,100 and one for $51,280, each of which was secured by a separate deed on the property being purchased. The security deed on the larger note was given first priority, and the deed securing the smaller note was given second priority. Both deeds were dated July 31, 2006, and identified Hildebrand as the borrower and CDC Federal

Credit Union as the lender. The deeds differed only slightly, in that the first priority security deed required Hildebrand to occupy the property within 60 days and remain there for at least a year unless the lender agreed otherwise in writing or the borrower experienced extenuating circumstances beyond her control. Another difference is that the final paragraph of the secondary lien deed, titled "Request for Notice of Default and Foreclosure Under Superior Security Deeds, Mortgages or Deeds of Trust," states,

> Borrower and Lender request the holder of any security deed, mortgage, deed of trust or other encumbrance with a lien which has priority over this Security Instrument to give notice to Lender, at Lender's address set forth on page one of this Security Instrument, of any default under the superior encumbrance and of any sale or other foreclosure action.

After the sale closed, the credit union assigned the two notes to Taylor, Bean & Whitaker Mortgage Corp., which subsequently assigned the smaller note to Bank of America, and the larger first mortgage note to Cenlar FSB. Green Tree Servicing, LLC, began servicing the second mortgage loan.

Hildebrand sent separate checks to the separate companies monthly, but eventually defaulted on both. She moved out of the condominium in December 2010, but continued to maintain and try to sell it. Hildebrand testified that she provided all

2

of her financial information to both mortgage companies jointly to try to obtain permission to sell the property for less than the amount owed on the notes, so she thought she was negotiating with both of them. She obtained an offer to buy the property for $185,000, of which her real estate agent said Green Tree would get $3,000, but Cenlar would not agree to a short sale and Green Tree would not negotiate about settling the debt secured by the second mortgage.

On June 7, 2011, Cenlar foreclosed on the first priority deed on the property and was also the highest bidder at $116,021. Cenlar filed both its foreclosure deed and a special warranty deed transferring the property to the Federal Home Loan Mortgage Corporation (Freddie Mac) on September 23, 2011. Bank of America sued Hildebrand in August 2012, seeking payment on the promissory note for the principal amount of $50,842 plus interest and attorney fees. The trial court granted summary judgment to the bank "for the reasons stated in the [bank's] Motion and Reply Brief."

1. Hildebrand argues on appeal that the trial court erred in granting summary judgment to the bank, because the two loans were "inextricably intertwined" and that the eventual sale of the notes to different parties after the closing did not "unlink" them. Therefore, she asserts, the funds secured by the second promissory note constitute a deficiency that cannot be collected because the foreclosure pursuant to

the first security deed was not confirmed. The bank responds that the first note and deed were held by a different creditor, whose actions did not foreclose the bank's right to recover under the second promissory note.

If a creditor conducts a non-judicial foreclosure and sells the property for less than the amount owed on the debt, it must report the sale within 30 days to a superior court judge in the county where the property is located and obtain confirmation and approval before instituting an action to obtain a deficiency judgment. OCGA § 44-14-161 (a). We have held that certain debts to the same creditor secured by liens on the same real property are so closely linked that the creditor cannot recover a second debt after foreclosing on the first debt unless the foreclosure is confirmed. For example, an action to recover debts evidenced by letters of credit that were secured by the same property that secured earlier promissory notes was actually a suit to recover a deficiency and was barred by the lender's failure to obtain judicial confirmation of its foreclosure under the notes. *Bank of N. Ga. v. Windermere Dev., Inc.*, 316 Ga. App. 33, 38 (1) (728 SE2d 714) (2012). In that case, "[b]ecause the debts were incurred for the same purpose, secured by the same property, held by the same creditor, and owed by the same debtor, they were inextricably intertwined." Id. at 39 (1).

Thus, if the same creditor still held both of Hildebrand's notes and the deeds securing those notes, it could not foreclose on the first note under the security deed, fail to obtain confirmation of the sale, and then sue Hildebrand to recover on the second note. *Iwan Renovations v. North Atlanta National Bank*, 296 Ga. App. 125, 129 (1) (673 SE2d 632) (2009). But in this case, the notes were sold to different entities. Neither deed had a "dragnet" clause expressly providing that the deed was intended to secure the payment of the note and any other debt owing to the grantee either then or later. See *Windermere*, 316 Ga. App. at 35. Despite the provision in the second security deed asking any superior priority lienholder to give the subordinate lienholder notice of default and foreclosure, nothing in the first note or deed required the holder to give such notice, and nothing in the documents underlying this transaction indicate that the subordinate lienholder held any rights regarding the first lienholder's decision to foreclose on the property. At the time Cenlar foreclosed on the first note, Bank of America owned the second note, and Bank of America had no authority to seek judicial confirmation of Cenlar's foreclosure. See *Titshaw v. Northeast Georgia Bank*, 304 Ga. App. 712, 714-715 (1) (697 SE2d 837) (2010) (assignee of creditor who foreclosed on property was proper party to seek confirmation of sale).

5

Hildebrand argues that "mortgages are either inextricably intertwined at the time they are executed or they are not" and it should not matter whether the loans are subsequently sold or not, an event over which the borrower has no control. "Inextricably" means that the linkage cannot be broken, she contends, and to hold that linked mortgages become "unlinked" when one loan is sold circumvents the purpose of the deficiency statute. Hildebrand's point that the utility of the deficiency statute is undermined by current mortgage loan practices may be well-founded.

Generally, "early American mortgage loans were two party transactions with lenders holding their own notes, collecting payments, and foreclosing on defaulting borrowers when necessary." Christopher L. Peterson , Predatory Structured Finance, 28 Cardozo L. Rev. 2185, 2194 (2007). Before the predecessor to OCGA § 44-14-161 (a) was enacted,

> it was the law of Georgia that in the event of insufficient return upon the sale of real estate as collateral, a suit could be maintained on the note to collect the deficiency. [The deficiency statute] does not eliminate this claim but subjects it to the condition that the foreclosure sale under power be given judicial approval. From the perspective of history and a consideration of the economic factors then extant, it is evident the intendment of the General Assembly in 1935, in adopting this statute, was to provide for debtor relief . . . [and] to limit and abate deficiency judgments in suits and foreclosure proceedings on debts.

(Citations and punctuation omitted.) *First National Bank & Trust Co. v. Kunes*, 230 Ga. 888, 890 (199 SE2d 776) (1973). "The confirmation statute was enacted at the height of the Great Depression and is intended to protect debtors. At the same time, it furthers the state policy of quieting title to land, and is to that extent useful to creditors as well." *Redman Indus., Inc. v. Tower Properties*, 517 F. Supp. 144, 148 (N.D. Ga. 1981).

Because the mortgage financing and construction industry ground to a halt during the Depression, "the federal government ushered in a "three-party" mortgage system by creating a secondary mortgage market designed to protect borrowers by underwriting loans." Barry Hester, Opportunity Costs: Nonjudicial Foreclosure and the Subprime Mortgage Crisis in Georgia, 25 Ga. St. U. L. Rev. 1205, 1209 (2009). Those three parties were the borrower, the lender, and the government as a guarantor or assignee, and this secondary mortgage market greatly increased the amount of capital available for long-term mortgage loans. Peterson, 28 Cardozo L. Rev. at 2197. In the 1970s, federal agencies began buying home mortgages and sold participation in mortgage "pools" that paid interest income to investors, which led to the eventual development of "private label home mortgage-backed securities." Id. at 2200-2201. Unlike the older two- or three-party loans,

contemporary asset-backed securities conduits often have eleven or more integral parties: a borrower, a broker, an originator, a seller, an underwriter, a trust, a trustee, multiple servicers, a document custodian (which may be closely involved in foreclosure proceedings), an external credit enhancer, a securities placement agent, and investors.

Id. at 2256.

These changes in the mortgage market have eroded the protections afforded by the confirmation statute. Hilderbrand argues that these protections can remain by maintaining the linkage between loans like hers that were initiated by the same creditor, with the result that the subsequent subordinate lienholder buys the loan "as-is" for purposes of the deficiency judgment statute. As a practical matter, however, if the mortgages remained linked, the result would be that a different subordinate lienholder would have no remedies at all if the superior lienholder foreclosed on the property if the amount of the superior lien exceeds the market price. The subordinate lienholder could neither foreclose on the property again, seek confirmation of the other creditor's sale, nor sue the borrower on the note.

Because Hilderbrand's mortgage loans were held by different entities when Cenlar foreclosed on its first-priority security deed, the loans were not inextricably

intertwined, and the trial court did not err in granting summary judgment to Bank of America on its suit on the note.

2. As Hildebrand concedes, the viability of her counterclaim alleging violations of the Fair Business Practices Act turns on whether her two loans were inextricably intertwined and thus whether Bank of America was justified in pursuing her for payment of the promissory note it held. Given our holding in Division 1, the trial court did not err in granting summary judgment to the bank on Hildebrand's counterclaim.

*Judgment affirmed. Boggs, J., concurs. Branch, J. concurs in Division 2 and in the judgment.*